IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

RAYMOND D. BROCK           )
                           )     Case No: 1:08-CV-235
v.                         )     COLLIER/CARTER
                           )
MICHAEL J. ASTRUE,         )
    Commissioner of Social Security  )

## REPORT AND RECOMMENDATION

This action was instituted pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the final decision of the Commissioner denying the plaintiff a period of disability, disability insurance benefits, and supplemental security income under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 416(I), 423, and 1382. This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil Procedure for a Report and Recommendation regarding the disposition of the plaintiff's Motion for Judgment on the Pleadings (Doc. 14) and defendant's Motion for Summary Judgment (Doc. 18).

For the reasons stated herein, I RECOMMEND the decision of the Commissioner be AFFIRMED.

### Plaintiff's Age, Education, and Past Work Experience

Plaintiff alleges he became disabled on January 7, 2005, when he was 27 years old. (Tr. 59). Plaintiff previously worked as a collector, laborer, funeral counselor, and salesman (Tr. 102).

1

## Applications for Benefits

Plaintiff filed his application for Disability Insurance Benefits and Supplemental Security Income in October 2005, alleging he became disabled on January 7, 2005, by back pain (Tr. 101). On November 13, 2007, Plaintiff testified at a hearing before Administrative Law Judge (ALJ) John MacLean, stating that in addition to back pain, he also suffered from depression (Tr. 755-81). A vocational expert also testified (Tr. 778-79). On March 25, 2008, the ALJ issued a decision, finding that Plaintiff was not disabled because he retained the ability to perform a limited range of light work and a significant number of jobs that accommodated his residual functional capacity and vocational profile (Tr. 15-24). On July 31, 2008, the Appeals Council denied review of the ALJ's decision (Tr. 7-10), making the March 25, 2008, decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981 and 416.1481.

## Standard of Review - Findings of the ALJ

Disability is defined as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §423(d)(1)(A). The burden of proof in a claim for Social Security benefits is upon the claimant to show disability. *Barnes v. Secretary, Health and Human Servs.*, 743 F.2d 448, 449 (6th Cir. 1984); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978). Once, however, the plaintiff makes a prima facie case that he/she cannot return to his/her former occupation, the burden shifts to the Commissioner to show that there is work in the national economy which he/she can perform considering his/her age, education and work experience.

*Richardson v. Secretary, Health and Human Servs*., 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 28 L. Ed. 2d 842, 92 S. Ct. 1420 (1971); *Landsaw v. Secretary, Health and Human Servs*., 803 F.2d 211, 213 (6th Cir. 1986). Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The Court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The Court of Appeals for the Sixth Circuit ("Sixth Circuit") has held that substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner*, 745 F.2d at 388 (citation omitted). The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Secretary, Health and Human Servs*., 790 F.2d 450 n. 4 (6th Cir. 1986).

After consideration of the entire record, the ALJ made the following findings:

> 1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2010.

3

2. The claimant has not engaged in substantial gainful activity since January 7, 2005, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.,* 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease, obesity and an anxiety-related disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find the claimant has the residual functional capacity to perform unskilled light work as defined in 20 CFR 404.1567(b) and 416.967(b) allowing a sit/stand option.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on January 15, 1977 and was 28 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

4

Case 1:08-cv-00235-CLC-WBC   Document 20   Filed 12/29/09   Page 4 of 20   PageID #: 73

> 11. The claimant has not been under a disability as defined in the
> Social Security Act from January 7, 2005, through the date of this
> decision (20 CFR 404.1520 (g) and 416.920(g)).

(Tr. 17-23).

## Issues Presented

Plaintiff raises two issues:

1) The ALJ erred by not finding Plaintiff disabled at Step 3 under Listings 12.04 and 12.06, and

2) The ALJ erred in finding Plaintiff "not a credible witness."

For reasons that follow, I conclude substantial evidence does support the ALJ's Step 3 finding that Plaintiff does not meet Listings 12.04 and12.06, and substantial evidence supports his credibility finding.

## Relevant Facts

### A. Testimony of Plaintiff

At the November 13, 2007, hearing, Plaintiff testified that in 1991, at the age of 14, he had his first back surgery (Tr. 767). Plaintiff explained he had a second surgery in March 2006 (Tr. 769).[1] Plaintiff stated he had to lie down three to four times per week due to back pain for up to an hour to relieve pressure in his back (Tr. 766). He also testified he could not sit longer than one and one half hours without experiencing numbing and aching (Tr. 766). He asserted he could not stand or walk for more than a twenty or thirty-minute period (Tr. 767). Plaintiff denied taking any pain medications but stated Valium, which he took along with Abilify for depression

---

[1] The medical records show that Plaintiff had his second surgery in March 2005 (Tr. 268-74).

5

and anxiety, helped with his pain (Tr. 765, 770). He also stated that he recently underwent a three-night stay at Crisis Stabilization Unit for depression and bipolar disorder and "to keep [him] from getting hooked on pain medication" (Tr. 768).

Plaintiff testified he tried returning to work as a funeral counselor shortly after his second surgery in 2005 but left after three months because "the physical demands of the job [made him] [un]able to perform" (Tr. 761-62). He explained his wife worked and that he helped his wife with cleaning, sweeping, and folding laundry (Tr. 764). He stated his wife did the shopping and washed the dishes and his landlord did the yard work (Tr. 764). He asserted his activities included spending the day with his 2 year-old daughter, watching t.v., and visiting family and friends (Tr. 764-65). He stated he used to be a musician (Tr. 764).

**B.      Medical Evidence**

In October 1991, at the age of 14, Plaintiff was diagnosed with a herniated disc at L2/3 with marked spinal stenosis below that level and underwent his first back surgery (Tr. 500-08). The record shows that in subsequent years, Plaintiff was treated variously for back, neck, knee, leg, and shoulder pain and reported an addiction to Hydrocodone (Tr. 140-52, 154-56, 162-67). On January 7, 2005, nearly a decade and a half after his first surgery, Plaintiff reported to the emergency room after twisting his back while at work (Tr. 257-63). Plaintiff was prescribed Lortab and Flexeril and discharged in stable condition (Tr. 262-63). Less than three months later, on March 28-29, 2005, Plaintiff underwent a second back surgery after being diagnosed with severe lumbar spinal stenosis, degenerative disc disease, and hypertrophic facet arthrosis from L3 to the sacrum with urinary incontinence (Tr. 268-274).

Between the time of Plaintiff's January 2005 work injury and March 2005 surgery, Plaintiff was treated in the emergency rooms of various hospitals- on over 20 occasions– for back pain in all but a few of the visits. Records in the weeks preceding Plaintiff's surgery show that he was variously prescribed morphine, methadone, Demerol, and Vicodin, among other medications (Tr. 358, 382, 389, 398). Records from a March 24, 2005, emergency room visit report that Plaintiff had slurred speech, was drowsy, and reported fainting (Tr. 211-12). The notes indicate that as Plaintiff improved during his stay, he began experiencing withdrawal symptoms, becoming violent and threatening hospital staff. Plaintiff jumped up out of bed in a threatening manner showing "absolutely no difficulty or limitation" (Tr. 212). Dr. Beeks was Plaintiff's surgeon. His treatment notes the following day state Plaintiff "ha[d] largely spiraled out of control." He remarked on the numerous emergency room treatments at various hospitals. Dr. Beeks stated Plaintiff's claimed urinary incontinence was "somewhat questionable" and he wondered whether this was real or something Plaintiff had been "coached on." (Tr. 285). He called his urinary continence into question and noted there was some evidence that the patient's history was not consistent with physicians findings (Tr. 285 - 287). He noted Plaintiff was "significantly over-utilizing the emergency room facilities," threatening hospital staff and security, and displaying symptoms secondary to narcotics addiction and psychiatric disturbance (Tr. 285). With reservations, he authorized immediate surgery, stating that in "spite of all the inconsistencies with this patient . . . . we must without having further evidence . . . .construe this as a medical urgency" (Tr. 287).

In follow-up visits with Dr. Beeks in the months after surgery, Dr. Beeks observed Plaintiff was "doing much better than expected" (Tr. 281) and noted the "hardware and grafts

7

appear to be in good position" (Tr. 278). In May 2005, Dr. Beeks released Plaintiff to return to work at the end of the month, restricting him to light duty with limited stooping and bending (Tr. 280). In June 2005, almost three months after his surgery, Dr. Beeks noted that "everything appears good" and stated that Plaintiff's only restriction was "limited stooping and bending" (Tr. 279). The physical therapy notes from July 2005, the final month of Plaintiff's physical therapy treatment, state that Plaintiff had no signs of pain or discomfort and had "good" toleration of clinical strengthening exercises (Tr. 554-56). By September 2005, Dr. Beeks, relying on a functional capacity assessment, found that Plaintiff could tolerate medium duty (Tr. 496). He concluded that Plaintiff had reached "medical maximum improvement" but was "fair[ly] likely" to require "some" on-going spine care (Tr. 496).

Throughout the remainder of 2005, Plaintiff continued to receive treatment in emergency rooms for various conditions (Tr. 303-60). He was seen in emergency rooms on approximately five occasions in June 2005, primarily related to gallbladder pain (also a twisted right knee), and Plaintiff underwent gallbladder surgery on June 20, 2005 (Tr. 324-44, 538-542, 580-596). In October 2005, the month after Dr. Beeks concluded that Plaintiff had reached maximum medical improvement and found him able to perform medium work, Plaintiff was treated in the emergency room three times, complaining of back and leg pain and problems with urination (Tr. 303-16, 574-76). Medications prescribed to Plaintiff at these visits included Valium, Vicodin, Toradol, and Demerol (Tr. 308, 315, 576). An x-ray of the spine at one of the October 2005 visits revealed post-surgical changes in the lower lumbar spine and mild endplate changes in the thoracolumbar spine (Tr. 577).

8

Dr. Reinhardt of Bradley Plaza Physicians treated Plaintiff in October 2005 for "back problems" (Tr. 469). The record reflects, however, that Plaintiff's back was not examined (Tr. 469). He was prescribed medications for diabetes, high blood pressure, and acid reflux and was given a referral for pain management and podiatry (Tr. 469). Dr. Reinhardt saw Plaintiff again the following month for anxiety and prescribed Paxil and blood pressure medication and advised Plaintiff to stop smoking and discussed weight loss (Tr. 465).

In February 2006 Plaintiff was treated in the emergency room for back pain (Tr. 631-35). Plaintiff was again referred to pain management (Tr. 632) and thereafter, treated with pain management specialist, Dr. Brown, on four occasions from April 2006 through August 2006 (Tr. 643-49). At the July 2006 visit, Plaintiff reported that his pain medications helped a lot, and he liked his TENS unit[2] (Tr. 645). Plaintiff stated that Effexor helped his nerve pain and that he used his TENS unit when Oxycontin wore off (Tr. 645). Dr. Brown prescribed Oxycontin and Lortab (Tr. 646). At his next and last visit in August 2006, Plaintiff reported that the medicine helped a lot when he had it but it was stolen from his car (Tr. 643). He stated he was doing okay overall (Tr. 643). Dr. Brown noted Plaintiff's appropriate affect and demeanor and again prescribed Oxycontin and Lortab (Tr. 643-44).

While Plaintiff also sought out treatment in 2006 for tooth aches, varicose veins, and flank pain (Tr. 619, 626, 637-39, 716-20), the record reveals that Plaintiff did not seek treatment again for his back pain until May 25, 2007. This was nine months after he treated with Dr. Brown, when he visited the emergency room, complaining of back pain that started two days

---

[2] Transcutaneous electrical nerve stimulation, more commonly referred to as TENS, is an application of electrical current through the skin for pain control. Wikipedia (visited May 5, 2009 <http://en.wikipedia.org/wiki/Transcutaneous_electrical_nerve_stimulation>).

9

earlier (Tr. 712 - 715).  Plaintiff reported to the emergency room again the following month.  He claimed his legs buckled, causing him to fall (Tr. 706-11).  An x-ray of the spine showed no abnormality of the lumbar spine and revealed the lumbar spine was stable compared to the May 2007 examination (Tr. 497, 711).  Plaintiff was prescribed Toradol (Tr. 710).  An MRI in August 2007 revealed localized lower thoracic kyphosis due to an old wedge compression deformity of T10 and some moderate degenerative spurring in the mid and lower thoracic spine (Tr. 699).

Plaintiff was treated for depression.  The record shows he sought treatment in July and August 2004, December 2005, and June and July 2007.  In July 2004, Plaintiff sought treatment at the Volunteer Behavioral Health Care System (VBHCS) while experiencing several personally difficult events/situations– marital difficulties with his first wife, the death of his father, and the break-up of his musical band (Tr. 687-91).  A Tennessee Clinically Related Group Form for Adults Ages 18 and Above ("TCRG Form"), prepared by John Gillahan on intake, rated Plaintiff's GAF at 65[3] and asserted that Plaintiff had "marked" limitations in interpersonal functioning and adapting to change (Tr. 692-94).  Plaintiff reported that he had held a gun to his head and then called a friend, who came to his aid (Tr. 687).  He confessed to thoughts of driving his car into oncoming traffic and of fantasies of hitting his wife (Tr. 687-88).  He acknowledged that he had no desire to hurt himself and that the gun incident was "a cry for help" (Tr. 687).  The next month Plaintiff reported "barely hanging on, not eating, not sleeping" (Tr. 686).  He stated

---

[3] A GAF of 65 indicates mild symptoms in one of the following: social, occupational, or school functioning.  Thus, the person is generally functioning pretty well and has some meaningful interpersonal relationships.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Text Revision* 34 (4th ed. 2000).

10

that his wife, with whom he still lived, was spending more time with her boyfriend and that the situation was "hurting him" (Tr. 686). He admitted to "whipp[ing] the [boyfriend's] ass" and said he would do it again if his wife neglected their son to be with the boyfriend (Tr. 686). He stated he felt like putting "a hole in [the boyfriend]" (Tr. 686). He reported that in the last year his grandmother who raised him had died, his father had died, and his wife was openly having an affair (Tr. 686). Plaintiff thereafter stopped visiting VBHCS, failing to show up for his August 24, 2004, and March 17, 2005, appointments (Tr. 685).

Plaintiff next received treatment over a year later in December 2005 at Pine Ridge (Tr. 598-608). He reported having a "custody/visitation issue with his ex-wife" and having thoughts of shooting his ex-wife (Tr. 606). He stated he had not seen his 3 year-old son in more than a year (Tr. 606). He claimed to have racing thoughts and trouble concentrating and to be wired all the time (Tr. 601, 606). He reported he had been violent, acted out or exhibited compulsive behavior in the past and explained, "drug use" (Tr. 606). His mood was described as depressed and sad and he was prescribed Paxil, Darvocet, and Lidoderm patches (Tr. 599, 607). He left his first session early "due to anxiety" and returned about a week later but was discharged for refusing to participate in "group" (Tr. 598). Plaintiff stated he would not return (Tr. 603).

A year and a half later in June 2007, Plaintiff was again treated at VBHCS (Tr. 679-83). A second TGRG Form, this time prepared by Tiffaney Cronan on intake, rated Plaintiff's GAF at 55[4] and asserted that Plaintiff had "marked" limitations in daily living, interpersonal functioning, concentration, task performance, and pace, based on statements of the client (Tr. 676-78). At the

---

[4] A GAF of 55 indicates Moderate symptoms, or moderate difficulty in one of the following: social, occupational, or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Text Revision* 34 (4th ed. 2000).

11

assessment, Plaintiff reported "dealing with a lot of depression" and not sleeping well and asserted that he did not know if he benefitted from his previous treatment at VBHCS and did not benefit from his prior treatment at Pine Ridge (Tr. 679). He stated that his brother had committed suicide a year earlier (Tr. 679). He explained he did not like to be in group therapy because he felt people were making fun of him (Tr. 679). Plaintiff denied taking any medications at that time (Tr. 680). Plaintiff missed his first scheduled appointment on June 21, 2007 (Tr. 675). At his July 5, 2007, appointment he stated he had been in jail the previous week for failure to pay child support (Tr. 675). Plaintiff stated he had thoughts of suicide while in jail but redirected his thinking (Tr. 675). Plaintiff was noted to be highly anxious, irritable, and depressed and was diagnosed with obsessive-compulsive disorder and bipolar I disorder with the most recent episode manic, moderate (Tr. 672, 673). A week later, Plaintiff was admitted for a three-day stay, after reporting being depressed and anxious (Tr. 668). During his stay, Plaintiff was noted to be pleasant and cooperative and to interact well with the staff and patients (Tr. 665-66). Plaintiff admitted to "extensive" drug and alcohol use in the previous three years but denied having a "real problem" and reported being "able to lay it down"- except for some THC use (Tr. 660). The day before his release from VBHCS, Plaintiff was described as smiling and having a "bright" affect and "friendly discussion" with others (Tr. 659). During his visit Plaintiff was medicated with Abilify, which was reported to be "working" (Tr. 656). On the day of discharge on July 15, 2007, Plaintiff reported feeling as if he could "stand on his feet and was headed in the right direction" after his stay there (Tr. 656).

### C. Testimony of the Vocational Expert

The ALJ asked the vocational expert ("VE") to consider a hypothetical individual with Plaintiff's residual functional capacity (Tr. 24, 778-79). The VE testified such a person could perform light work as an assembler (1,500 jobs in the regional economy) and production inspector (1,000 jobs in the regional economy) (Tr. 24, 779). The ALJ found the VE's testimony to be consistent with the information contained in the *Dictionary of Occupational Titles* (Tr. 24, 779).

<u>Analysis</u>

**1) Is the ALJ's Finding that Plaintiff Does Not Meet Listings 12.04 and 12.06 Supported by Substantial Evidence?**

To meet Listing 12.04 (affective disorders), Plaintiff must satisfy the criteria of Paragraph A and also satisfy either Paragraphs B or C. To satisfy Paragraph A, Plaintiff must have a medically documented persistence, either continuous or intermittent, of one of the following: (1) depressive syndrome characterized by at least four of the following: (a) anhedonia or pervasive loss of interest in almost all activities, or (b) appetite disturbance with change in weight, or (c) sleep disturbance, or (d) psychomotor agitation or retardation, or (e) decreased energy, or (f) feelings of guilt or worthlessness, or (g) difficulty concentrating or thinking, or (h) thoughts of suicide, or (i) hallucinations, delusions, or paranoid thinking, or (2) manic syndrome characterized by at least three of the following: (a) hyperactivity, or (b) pressure of speech, or (c) flight of ideas, or (d) inflated self-esteem, or (e) decreased need for sleep, or (f) easy distractability, or (g) involvement in activities that have a high probability of painful

13

consequences which are not recognized, or (h) hallucinations, delusions, or paranoid thinking, or (3) bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (Listing 12.04).

To satisfy Paragraph B, Plaintiff must show that the medically documented finding results in at least two of the following: (1) marked restriction of activities of daily living, or (2) marked difficulties in maintaining social functioning, or (3) marked difficulties in maintaining concentration, persistence, or pace, or (4) repeated episodes of decompensation each of an extended duration (Listing 12.04). To satisfy Paragraph C, Plaintiff must show a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation, each of extended duration, or (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate, or (3) current history of one or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement (Listing 12.04).

To meet Listing 12.06 (anxiety related disorders), Plaintiff must satisfy the criteria of its Paragraph A and also either Paragraphs B or C (Listing 12.06). To satisfy Paragraph A, Plaintiff must demonstrate a medically documented finding of at least one of the following: (1) a generalized persistent anxiety accompanied by three out of four of the following signs or symptoms: (a) motor tension, or (b) autonomic hyperactivity, or (c) apprehensive expectation, or (d) vigilance and scanning, or (2) a persistent, irrational fear of a specific object, activity, or

situation, or (3) recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average at least once a week, or (4) recurrent obsessions or compulsions which are a source of marked distress (Listing 12.06). Paragraph B under Listing 12.06 is identical to Paragraph B under 12.04 (Listings 12.04 and 12.06). To satisfy Paragraph C under Listing 12.06, Plaintiff must show that the medically documented finding results in a complete inability to function independently outside the area of one's home (Listing 12.06).

Plaintiff argues the ALJ's analysis of the Paragraph B criteria under Listings 12.04 and 12.06– which are the same– was flawed (Doc 15, Plaintiff's Memorandum, 7-11). He claims that the TCRG Forms completed in July 2004 and June 2007, respectively, show that Plaintiff had marked limitations, satisfying the Paragraph B criteria, and that the ALJ violated the "treating physician rule" by not giving these assessments controlling weight.

The TCRG forms do not show they were completed by a licensed physician or psychologist. As the Commissioner argues, the forms do not describe the qualifications, if any, of the assessors but merely provide their names, John Gillahan and Tiffaney Conan, respectively (Tr. 20-21, 678, 694). Therefore, the evidence reveals that these forms were not completed by "acceptable medical sources." *See* 20 C.F.R. §§ 404.1502, 416.902; Social Security Ruling 06-03p (stating that acceptable medical sources include licensed physicians and psychologists). Social Security Ruling 06-03p explains that information from other sources, such as physician assistants, nurse practitioners, social workers, and therapists, may provide "insight" but cannot establish a medically determinable impairment. Rather, that evidence must come from an

acceptable medical source (Social Security Ruling 06-3p). Listing 12.00 deals with Mental Disorders and Listing 12.00 B. provides:

> B. Need for medical evidence. We must establish the existence of a medically determinable impairment(s) of the required duration by medical evidence consisting of symptoms, signs, and laboratory findings (including psychological test findings). Symptoms are your own description of your physical or mental impairment(s). Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception, as described by an appropriate medical source.

In addition, I consider it significant and, in doing so, agree with the Commissioner that the assessments were made upon "intake" and, as observed by the ALJ, appear to be based on the statements of Plaintiff prior to any treatment. They are unsupported and unverified by treatment notes (Tr. 20-21, 676-78, 692-94). Thus, the evidence shows that they are not notes from a licensed physician or psychologist and are not supported by treatment notes. I conclude the ALJ correctly refused to accord them controlling weight (Tr. 20-21, 676-78, 692-94).

Plaintiff also contends that the ALJ "perceived [a] lack of ongoing mental health treatment" and, in response, Plaintiff recounts his statement at VBHCS that he either did not benefit or did not know if he benefitted from his past mental health treatment (Tr. 20-22, 679, Doc. 15, Plaintiff's Memorandum at 9). The ALJ observed Plaintiff's mental health treatment appeared to have been for discrete problems, such as marital difficulty, rather than on-going mental health issues (Tr. 20). The ALJ also noted the frequency of treatment was inconsistent with Plaintiff's levels of complaints (Tr. 22). The record shows Plaintiff first sought treatment in July and August 2004 following marital difficulties with his wife, the death of his father, and

16

the break-up of his band, and then again more than a year later in December 2005 when he was having custody issues with his ex-wife, and then a year and a half later in June and July 2007 following his incarceration for failure to pay child support and the suicide of his brother (Tr. 606, 654-75, 686-88). These are all significant stressors which would likely cause some level of depression but does not establish listing level severity.

The evidence indicates Plaintiff just stopped going during his 2004 treatment, failed to show up for two appointments, and refused to participate as requested during his 2005 treatment, leading to his discharge (Tr. 20-22, 598-608, 686-88; Doc. 15 at p 9). When Plaintiff returned for treatment in 2007 and participated as requested, his treatment appears to have improved his condition (Tr. 656). He was smiling, had a bright effect, had friendly discussions with others, was having success with his medication, and felt he could "stand on his feet and was heading in the right direction" (Tr. 654, 656, 659). Accordingly, I conclude substantial evidence supports the ALJ's finding that Plaintiff had only mild difficulties in activities of daily living and mild to moderate difficulties with concentration, persistence, and pace, and, therefore, does not satisfy the Paragraph B criteria of Listings 12.04 and 12.06. Consequently, Plaintiff does not meet Listings 12.04 or 12.06.

**2). Is the ALJ's Finding that Plaintiff was not a Credible Witness Supported by Substantial Evidence?**

The ALJ used a two-step process to evaluate Plaintiff's symptoms (Tr. 21). *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). First, the ALJ determined if there was an underlying medically determinable physical condition or mental impairment that could

reasonably be expected to produce Plaintiff's pain (Tr. 17-18).  *See* 20 C.F.R. §§ 404.1529(b) and 416.929(b) (describing the requirement of a medically determinable impairment that could reasonably be expected to produce the alleged symptoms).  The ALJ found that the medical evidence documented impairments that could reasonably be expected to produce pain (Tr. 21-22).  Second, the ALJ evaluated the intensity, persistence, and functionally limiting effects of Plaintiff's symptoms considering all relevant evidence, both subjective and objective (Tr. 21-22). 20 C.F.R. §§ 404.l529(c) and 416.929(c).  The ALJ discussed the medical evidence and contrasted that with Plaintiff's testimony and other evidence regarding his pain, his abilities, and his limitations (Tr. 20-21).  *See* 20 C.F.R. §§ 404.1545 and 416.945 (declaring that the ALJ must weigh medical evidence and statements about symptoms to determine the residual functional capacity).  The ALJ concluded Plaintiff's allegations of disabling symptoms were not credible (Tr. 22).  I conclude the ALJ's reasons for his residual functional capacity finding are supported by the record.

The ALJ found that the medical opinions did not substantiate Plaintiff's allegations of disabling symptoms (Tr. 22-23).  The ALJ noted Dr. Beeks released Plaintiff to light duty by May 2005, that x-rays subsequent to the surgery showed only surgical changes, and the final x-ray in the record in June 2007 revealed a stable spine with no abnormalities (Tr. 22, 280, 497).

The ALJ also noted Plaintiff's second surgery was ordered with some reservations given Plaintiff's inconsistent statements to doctors, over-utilization of emergency room facilities, and narcotics use. The ALJ further noted that Plaintiff's doctors saw him ambulating with no limitation or difficulty and jumped out of bed with absolutely no difficulty (Tr. 22, 212).  Dr. Beeks stated Plaintiff's claimed urinary incontinence was "somewhat questionable" and he

18

wondered whether this was real or something Plaintiff had been "coached on." (Tr. 285). He called his urinary incontinence into question and noted there was some evidence that the patient's history was not consistent with physicians' findings (Tr. 285 - 287). The ALJ observed that by August 2006, Plaintiff reported significant improvement with medication and use of the TENS unit (Tr. 19, 643-45).

Plaintiff complains an August 2007 MRI showed moderate degenerative spurring in the mid and lower thoracic spine (Tr. 699). (Doc. 15, Plaintiff's Memorandum, p. 12). The ALJ considered the August 2007 MRI results but also noted Plaintiff failed to seek out any further treatment (Tr. 19). The ALJ additionally considered the lack of treatment from July 2006 to mid-2007, a nine-month period in which the record reveals that Plaintiff sought no treatment whatsoever for his back pain (Tr. 22, 643, 713-15). See Social Security Ruling 96-7 (stating that a failure to seek medical treatment may be an indicator the symptoms may not be severe).

In making his residual functional capacity determination, the ALJ stated he was aided by the May 2005 opinion by Dr. Beeks, Plaintiff's surgeon, in finding Plaintiff able to perform light work[5], as opposed to Dr. Beeks's more demanding September 2005 assessment releasing Plaintiff to medium work (Tr. 280, 496). While the ALJ found the record supported some limitation due to Plaintiff's back impairment, he concluded the record supported Plaintiff's ability to perform light work allowing for a sit/stand option (Tr. 22). Substantial evidence, including the opinions of Plaintiff's treating surgeon, supports the ALJ's finding that Plaintiff's

---

[5] Light work demands only occasional stooping and so the ALJ's residual functional capacity assessment is, likewise, consistent with the stooping limitations identified by Dr. Beeks. See Social Security Ruling 83-10.

allegations of disabling symptoms were not fully substantiated. *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) (explaining that a claimant's credibility may properly be discounted where the ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence). I conclude there is substantial evidence to support the credibility assessment made by the ALJ.

<u>Conclusion</u>

For the reasons stated herein, I RECOMMEND the Commissioner's decision be AFFIRMED. I further RECOMMEND the defendant's Motion for Summary Judgment (Doc. 18) be GRANTED, the plaintiff's Motion for Judgment on the Pleadings (Doc. 14) be DENIED, and this case be DISMISSED.[6]

Dated: December 29, 2009        <u>s/William B. Mitchell Carter</u>

---

[6]Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).